IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


UNITED STATES OF AMERICA    )
                            )
                            )        CRIMINAL ACTION NO.
      v.                    )          2:12cr142-MHT
                            )             (WO)
KIMBERLY LASHUN FLOWERS     )

OPINION

Defendant Kimberly Lashun Flowers pled guilty to one count of passing a forged United States Treasury check in violation of 18 U.S.C. § 510(a)(2).  Flowers entered her plea pursuant to an agreement with the government according to which the government would recommend a sentence of monitored home confinement rather than imprisonment.  At sentencing, the United States Probation Department announced that, due to new financial constraints resulting from the sequestration of federal funds, the department would require Flowers to pay the cost of the monitoring of her home confinement, and this Flowers could not do because she is poor.  With home

confinement off the table, the government pressed the court to send Flowers to prison. Finding this result disconsonant with both the U.S. Constitution and simple fairness, the court instead imposed a below-guidelines sentence of probation without monitored home confinement. This sentence, which amounted to a 'variance,' took into consideration Flowers's well-documented mental illness and consequent diminished culpability, her need for treatment outside of a carceral setting, the substantial time Flowers had already spent on monitored home confinement during her pretrial supervision, and the fact that, but for her indigence, she would have received a sentence of monitored home confinement. This opinion sets forth in further detail the court's reasons for the sentence and variance imposed pursuant to 18 U.S.C. § 3553(a), which sets forth the factors to be considered in imposing a sentence.

## I. BACKGROUND

### A. The Offense

Flowers cashed a fraudulent United States Treasury check worth $ 20,380. According to Flowers, she was asked to do so by Timothy Rollins, a close friend who had lived with her when she was a child. Rollins told Flowers that the cash belonged to his girlfriend and that he needed Flowers's help in cashing the check because his girlfriend owed him money. Flowers agreed to help, and, in return for her assistance, Rollins paid her $ 500 out of the approximate $ 10,000 he received from the check.

The check was issued as part of a fraudulent tax-refund business run by another criminal defendant, Keshia Brayboy. Because it was determined that Flowers had no role in, or knowledge of, this larger fraud on the government, she was not held criminally responsible for the tax-fraud scheme.

## B. Personal History and Mental Health

Dr. Adriana Flores performed a psychological evaluation of Flowers, the results of which were presented to the court through a written report and Dr. Flores's testimony at sentencing.

Dr. Flores described Flowers's childhood history as severely traumatic. Flowers's father is an alcoholic who abused her mother in shocking acts of violence. He once forced Flowers's mother to disrobe and then branded her body with a hot iron. Flowers observed this but was powerless to intervene. Another time he threatened her mother with a cocked gun. Her father was controlling and dictatorial; he would remove pieces of Flowers's mother's car so that she could not leave him. He was also mentally abusive; he called both Flowers and her mother "bitches" and other derogatory names. This history was corroborated by multiple sources, including Flowers's childhood friends.

Dr. Flores explained that this sustained history of domestic abuse created severe psychiatric problems for Flowers. She is depressed; she suffers from panic attacks and anxiety; she is suicidal. She has trichotillomania, a psychiatric disorder which leads her to pull her hair out of the top of her head. Dr. Flores also explained that there are genetic roots to Flowers's psychiatric problems on both sides of her family.

Flowers's mother reported first noticing Flowers's mental-health problems when she was ten years old; Flowers would experience dramatic mood swings and periodically isolate herself from all social interaction. Flowers tried to kill herself when she was 12 by ingesting a handful of pills from a bottle. During her 20s, Flowers's depression deepened and she expressed many times that she did not wish to continue living. She cut her wrists more than once, and, after one of these incidents, she was formally diagnosed with depression and prescribed medication. At the time of the instant

offense, Flowers was not taking the medication she had been prescribed and her mental illness was untreated.

Dr. Flores explained that Flowers developed Posttraumatic Stress Disorder (PTSD) in response to her early childhood trauma, and she found that Flowers experiences flashbacks to certain abusive scenes from her past--particularly the image of her father burning her mother with an iron. According to Dr. Flores, the best indicator of the severity of Flowers's PTSD is that it has numbed her to violence against herself. Flowers was in an abusive relationship with the father of her three children for many years. He pushed her through a glass table, which left her needing 40 stitches; he jumped her and fractured her wrist; he also punched her in the face while she was driving a car, causing her to drive off the road and receive a facial laceration.

In sum, Dr. Flores diagnosed Flowers with Major Depressive Disorder (recurring, moderate), PTSD, Trichotillomania, Anxiety Disorder, and a history of

Panic Disorder (in remission over the last two years).
She found "the fact that Ms. Flowers meets diagnostic
criteria for several comorbid conditions is reflective of
a high level of psychological pathology that is likely
due to her extensive trauma history throughout her life,
in various forms, by multiple perpetrators (i.e. her
father and her boyfriend)." Report (Doc. No. 34) Ex. 9
at 15. She further found that "Ms. Flowers' multiple
psychiatric conditions render her vulnerable to poor
decision making and to be easily led by others. ... She
is a weak-minded individual who is easily influenced,
particularly if she believes she is helping someone."
Id. at 13. Dr. Flores opined that this susceptibility to
the influence of others explains not only the instant
offense, but Flowers's entire criminal history.

At sentencing, Dr. Flores discussed Flowers's
treatment needs. She recommended that the court require
Flowers to participate in mental-health treatment. She
explained that a mandate would spur Flowers to initiate

treatment and that once she is in treatment her symptoms should improve. Dr. Flores further opined that Flowers should receive this treatment in the community, not in prison, as the environmental stressors of incarceration would exacerbate Flowers's mental illnesses and impede her recovery.

## C. Procedural History

Flowers was charged with, and pled guilty to, one count of passing a forged United States Treasury check, a violation of 18 U.S.C. § 510(a)(2). After accepting the government's motion for a one-level-downward departure, the court found Flowers to have a total-offense level of seven and a criminal-history category of IV. Flowers thus had a Sentencing Guidelines range of 8-14 months. This guidelines range put Flowers in "Zone B," with the result that the minimum guidelines term did not have to include a term of incarceration, but instead could be satisfied by a term of probation that

includes intermittent confinement, community confinement, or home detention. United States Sentencing Commission, <u>Guidelines Manual</u>, § 5C1.1(c) (Nov. 2012).

In its sentencing memorandum, the government recommended monitored home confinement as a substitute for imprisonment, "if applicable." U.S.A. Mem. (Doc. No. 30) at ¶ 4. The government made this recommendation in accordance with the plea agreement, one term of which specified that, "If the Sentencing Guidelines require a sentence of imprisonment, the United States recommends the imprisonment be substituted by home detention pursuant to ... U.S.S.G. § 5C1.1(c) [Zone B] and (d) [Zone C] if applicable." Pl. Agmt. (Doc. No. 22) at ¶ 1(c).

The United States Probation Department recommended that Flowers receive a sentence of imprisonment. In rejecting home detention, the department relied on an application note to USSG § 5C1.1, which states: "The use of substitutes for imprisonment as provided in

subsections (c) and (d) is not recommended for most defendants with a criminal history category of III or above." USSG § 5C1.1, comment. (n.1). Not only would the Probation Department not recommend home confinement, it informed the court that, even if the court ordered Flowers to serve a home-confinement sentence, the department would not pay for the required monitoring of it. The department acknowledged that it would not pay for Flowers's home confinement because of new financial constraints imposed by the 'sequestration of federal funds.'[1] Flowers would have received a sentence of monitored home confinement if she paid for it herself. All parties agreed, however, that Flowers is indigent and cannot afford the $ 300-a-month price tag for the

---

1. See Chief Judge William B. Traxler, Jr., Chairman of the Executive Committee of the Judicial Conference of the United States, Statement on Impact of Sequestration on Judiciary, Defender Funding (Apr. 17, 2013), available at news.courts.gov/statement-impact-sequestration-judiciary-defender-funding ("Funds have been reduced for probation and pretrial staffing, which means less deterrence, detection, and supervision of released felons from prison.").

required monitoring of her home confinement: she is a single mother of three young children, her children's father does not pay his child-support obligation, and her total monthly cash flow is $ 133. Indeed, the Probation Department recommended waiving imposition of fines due to Flowers's financial condition.

Because the Probation Department refused to pay for Flowers's monitored home confinement and because Flowers could not pay the cost due to her poverty, the government deemed the home-confinement substitution "not applicable." As such, the government refused to recommend home confinement at Flowers's sentencing. Instead, the government recommended that she serve 14 months in prison. Flowers sought a downward variance and sentence of probation.

Applying 18 U.S.C. § 3553(a), the court imposed a four-year term of probation with a mandatory condition that Flowers participate in a mental-health-treatment program. In issuing the below-guidelines sentence, the

court considered the fact that, but for Flowers's poverty, she would have received home confinement.[2] The court also considered her diminished culpability due to mental illness, her need for treatment outside of prison, and the six-month-home-confinement term Flowers had already completed while on pretrial supervision.

## II. DISCUSSION

A. <u>Mental Health</u>

As this court explained in <u>United States v. Ferguson</u>, \_\_\_\_ F.Supp.2d \_\_\_\_, \_\_\_\_, 2013 WL 627145 at *6 (M.D. Ala. 2013) (Thompson, J.), a recent amendment to the Sentencing Guidelines endorses 'departures' from Zone C of the sentencing table (which requires imprisonment) to Zone B (which allows confinement in lieu of imprisonment) in order to achieve a "specific treatment purpose." <u>Id</u>. (discussing Amendment 738, codified at USSG 5C1.1,

---

2. At sentencing, there was no suggestion, and thus no discussion, that there might be defendants for whom home confinement without monitoring might work.

12

comment. (n. 6)). This amendment and others "demonstrate that, where mental illness ... [is] a contributing factor greatly or even only limitedly in a crime, such defendants are more likely less-deserving of punishment for punishment's sake than are those without such limitations." Id. at ____, 2013 WL 627145 at *8. The amendments reflect a growing recognition of the importance of treating, rather than punishing, mentally ill defendants and an understanding that prison may not be the appropriate setting for such treatment. Id. In light of these amendments, this court concluded, "it can now reasonably be argued that, in fashioning an appropriate sentence, courts are now required to consider, and factor in, a defendant's mental illness if they are to be faithful to [18 U.S.C.] § 3553(a)." Id.

Although the amendments at issue here apply most clearly in the context of departures, the reasoning behind the amendments informs this court's consideration of a variance based on the factors set forth in 18 U.S.C.

§ 3553(a).  Id.; United States v. Todd, 618 F.Supp.2d
1349, 1353 (M.D. Ala. 2009) (Thompson, J.).

The evidence at Flowers's sentencing showed she
suffers from multiple untreated psychiatric disorders
which affect her judgment and decision-making.  These
disorders contributed to the instant offense as well as
to her past crimes, as her participation in all of these
crimes was at the behest of friends and family who
exerted influence over her.

There was further evidence that Flowers would be more
amenable to mental-health treatment in her community and
that prison would exacerbate her mental illness.  Despite
this evidence, the court was unable to sentence Flowers
to a term of home confinement for no reason other than
the Probation Department's current lack of funding.
Admittedly, there are two other substitutes for
imprisonment for defendants in Zone B of the sentencing
grid: intermittent confinement and community confinement
in a residential-treatment facility.  But intermittent

confinement poses the same drawbacks as imprisonment: taking Flowers out of the stability of her home environment and introducing her to the stressors of incarceration. Community confinement in a residential treatment facility would likewise disrupt the stability of Flowers's home life and--since most such facilities focus on substance-abuse recovery--would not be appropriate for Flowers, who has no history of substance abuse. Faced with these limited options, the court reasoned that a lengthy sentence of probation coupled with a mandatory condition of participation in mental-health treatment would best accomplish the goal of addressing the root cause of Flowers's criminality--her mental illness. A downward variance in this case was thus warranted in order to achieve "a specific treatment purpose" and is in line with the Sentencing Commission's recent redirection on factoring mental health into the determination of a reasonable sentence. See Ferguson, ___ F.Supp.2d at ____, 2013 WL 627145 at *8.

## B.  Inability to Pay for Monitored Home Confinement

The court modifies, it thinks aptly here, a famous Supreme Court quote as follows: "There can be no equal justice where the kind of [punishment] a man gets depends on the amount of money he has." Griffin v. Illinois, 351 U.S. 12, 16 (1956).  Nonetheless, Flowers confronted exactly this situation: If she could cough up the money for monitored home confinement she would avoid prison, but because she is poor she did not have the chance to do so.

While this may be the first time a court has confronted this precise scenario, the principle that wealth and poverty have no place in sentencing decisions is nothing new.  It is unconstitutional to keep a defendant in prison longer than the maximum time for her crime merely because she is unable to pay a court-ordered fine,  Williams v. Illinois, 399 U.S. 235, 243 (1970), and, similarly, it violates the Constitution's guarantee of equal protection under the laws to convert a fine-only

16

sentence into a prison term based on inability to pay. <u>Tate v. Short</u>, 401 U.S. 395, 398 (1971). The Constitution likewise prohibits courts from revoking a term of probation for failure to pay a fine or restitution, absent evidence that the probationer's failure to pay was willful. <u>Bearden v. Georgia</u>, 461 U.S. 660, 673 (1983) (finding it fundamentally unfair and a violation of Due Process to deprive a probationer of her freedom because of a circumstance--poverty--that she could not control). In each of these cases, the State had found that the purposes of punishment could be satisfied by imposing a non-prison sentence, but then sent the defendant to prison because he or she could not afford the less restrictive option. <u>See</u> <u>id</u>., 461 U.S. at 667-68 (viewing <u>Williams</u> and <u>Tate</u> as teaching that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay for it."). While relative wealth

17

and poverty will inevitably have some effect on the administration of justice, any sentence that subjects a criminal defendant "to imprisonment solely because of ... indigency" is constitutionally infirm and cannot stand. Tate, 401 U.S. at 398; see also Pugh v. Rainwater, 572 F.2d 1053 (5th Cir. 1978) (en banc) ("At the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible."); Barnett v. Hopper, 548 F.2d 550, 554 (5th Cir. 1977) ("To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws."), vacated as moot, 99 S. Ct. 714 (1978); Frazier v. Jordan, 457 F.2d 726, 727 (5th Cir. 1972) (finding alternative sentencing scheme, that is, $ 17 dollars or 13 days in jail, unconstitutional as applied to indigent defendants who, by definition, could not receive non-jail option).[3]

---

3.    The Eleventh Circuit has adopted as precedent all
(continued...)

Sending Flowers to prison because she is poor and cannot pay the cost of monitored home confinement thus raises serious constitutional concerns. Yet, as explained, the court was asked to do just that. The attorney for the government described the situation succinctly when he said: "Your Honor, the Plea Agreement ... recommends that imprisonment be substituted by home detention if applicable. My statement to the Court is it's not applicable because she's not able to afford to pay for home detention and, therefore, she shouldn't be given something she can't do." Stg. Hrg. Transcript. The court expressed doubt as to the constitutionality of such a bind and asked: "[H]ow can I in any way consider in fashioning her sentence the fact that she is poor? If someone could afford this monitoring, home confinement, they could get it and she doesn't because she simply doesn't have the money. That just runs against

_____

3.(...continued)
decisions of the former Fifth Circuit rendered prior to October 1, 1981. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981)(en banc).

everything our nation stands for.  How can I do that?"
Id.  The government did not have a satisfactory response
to the court's questions and eventually conceded it would
be wrong to consider Flowers's poverty in imposing her
sentence.

The wrongfulness is particularly acute here, where
Flowers was denied the benefit of her plea agreement
merely because she could not afford its terms.  The
government implicitly agreed that imprisoning Flowers was
not necessary when it agreed to recommend monitored home
confinement as a substitute.  But instead of the home-
confinement recommendation the government had agreed to
and she had exchanged her guilty plea for, Flowers faced
months in prison.

In addition to raising a serious constitutional
question, sending Flowers to prison because she could not
afford the required monitoring for home confinement runs
contrary to the Sentencing Guidelines's clear directive
that socio-economic status is "not relevant" to the

determination of an offender's sentence. USSG § 5H1.10;
28 U.S.C. § 994(d) ("The [Sentencing] Commission shall
assure that the guidelines and policy are entirely
neutral as to the... socioeconomic status of
offenders."); see also Koon v. United States, 518 U.S.
81, 91 (1996) (noting that, under this guideline,
socioeconomic status is "never a permitted basis for a
departure"). Weighing Flowers's indigency against her in
deciding whether to impose a prison sentence would
frustrate the Sentencing Guidelines' purpose of "avoiding
unwarranted sentencing disparities among defendants with
similar records," Mistretta v. United States, 488 U.S.
361, 374 (1989) (quoting 28 U.S.C. § 991(b)(1)), as a
defendant identical to Flowers but with a thicker
billfold would receive home confinement, while Flowers
would receive prison.  This is the definition of an
"unwarranted" sentencing disparity made flesh.

In sum, while a court should be particularly
reluctant to reach broad legal, or even factual,

conclusions based on the limited circumstances of one person, it does appear that the Constitution's guarantee of equal protection is inhospitable to the Probation Department's policy of making monitored home confinement available to only those who can pay for it. As this court has already explained, it is inequitable for indigent defendants who cannot pay for home-confinement monitoring to be imprisoned while those who can pay to be subject to the more limited monitored home confinement avoid prison. Moreover, the economic unfairness works both ways: Not only is poverty an impermissible sentencing factor, but wealth is too. It is also inequitable for non-indigent defendants who can pay for monitored home confinement to be treated more harshly than indigent defendants who cannot pay, that is, it is inequitable for non-indigent defendants who can pay for monitored home confinement to receive it while otherwise similarly situated indigent defendants who cannot pay for it to receive a sentence of probation without monitored

home confinement.  The Probation Department may want to rethink its policy.[4]

And the burden of the sentencing inequalities resulting from a dearth of resources must be borne by the government, and not apportioned among defendants based on their relative financial resources.  It would be simply unfair to penalize a defendant for the fact that the Probation Department's federal funding has run dry.  Between the two parties, the weight of the inequality resulting from the lack of funding must rest with the government, not the defendant.  Governments "routinely make tradeoffs in the allocation of limited resources, and it is reasonable that [the government] bear the consequences of these choices."  <u>Boyer v. Louisiana</u>, 569

---

4. As stated previously, <u>see</u> <u>supra</u> note 2, at sentencing there was no suggestion, and thus no discussion, that there might be defendants for whom home confinement without monitoring might work.  In other words, home confinement could be limited to those who could be trusted to comply.  The imposition of the requirement in such circumstances would not be based on a defendant's wealth or poverty.  Of course, this is just one possible solution.  There may be others.

U.S. \_\_\_, 2013 WL 1788077 at \*5 (2013) (Sotomayor, J., dissenting from dismissal of writ of certiorari).

                        \*\*\*

In conclusion, for the above reasons, the court believed that the sentence Flowers received met all the requirements of 18 U.S.C. § 3553(a) and was reasonable.

DONE, this the 22nd day of May, 2013.

                    \_\_\_ /s/ Myron H. Thompson \_\_\_
                    UNITED STATES DISTRICT JUDGE